UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

Rickie Allen Kirchner,　　　　　　　　　　　　　Civil No. 12-1331 (JRT/SER)

　　　　　Plaintiff,

v.　　　　　　　　　　　　　　　　　　　　　　**REPORT AND RECOMMENDATION**

Carolyn W. Colvin,[1]
Commissioner of Social Security,

　　　　　Defendant.

---

　　　　Neut L. Strandemo, Esq., 1380 Corporate Center Curve, #320, Eagan, MN, 55121, on behalf of Plaintiff.

　　　　Ana H. Voss, Esq., Office of the United States Attorney, 600 U.S. Courthouse, 300 South Fourth Street, Minneapolis, MN 55415, on behalf of Defendant.

---

STEVEN E. RAU, United States Magistrate Judge

　　　　Pursuant to 42 U.S.C. § 405(g), Plaintiff Rickie Allen Kirchner ("Kirchner") seeks review of the Commissioner of Social Security's ("Commissioner") denial of Kirchner's application for social security disability insurance ("SSDI"). This matter was referred to the undersigned for a Report and Recommendation pursuant to 28 U.S.C. § 636 and the District of Minnesota Local Rule 72.1. Cross-motions for summary judgment were filed [Doc. Nos. 6 and 9], and for the reasons set forth, the Court recommends Kirchner's motion for summary judgment be denied, and the Commissioner's motion be granted.

---

[1]　　Carolyn W. Colvin is Acting Commissioner of Social Security. She is substituted as the defendant pursuant to Federal Rule of Civil Procedure 25(d).

1

## I. BACKGROUND

### A. Procedural History

This is Kirchner's second appeal of an ALJ decision denying his June 2006 application for SSDI, alleging a disability onset date of October 20, 2004. (Admin. R. at 89-94.) [Doc No. 5.] Kirchner claimed disability due to back injury, narcolepsy, sleep apnea and diabetes. (*Id.* at 125.) Kirchner's applications were denied initially on October 18, 2006, and reconsideration was denied on December 22, 2006. (*Id.* at 53-57, 59-61.) Kirchner requested a hearing. (*Id.* at. 64) Administrative Law Judge David Gatto heard the matter on October 29, 2008. (*Id.* at 14-44.) On February 26, 2009, ALJ Gatto issued an unfavorable decision. (*Id.* at 4-13.) The Appeals Council denied Kirchner's request for review of the ALJ's decision on June 4, 2010. (*Id.* at 1-3.)

Kirchner sought judicial review in the United States District Court, District of Minnesota. On June 28, 2011, the Honorable Paul A. Magnuson adopted in part and rejected in part the Report and Recommendation of Magistrate Judge Leo I. Brisbois, and remanded the action for further development of the record, particularly for evaluation of Listing 4.11(B) chronic venous insufficiency. *Kirchner v. Astrue*, Civ. No. 10-3263 (PAM/LIB) 2011 WL 2555380 (D.Minn. June 28, 2011). Whether Kirchner's stasis dermatitis met the listing requirements, given the long gap in the records between the diagnosis of stasis dermatitis changes in his legs in 2004 and a medical record reflecting stasis dermatitis changes in his legs in 2006 was unclear to Judge Magnuson. *Id.* at *3. The Appeals Council vacated the Commissioner's decision and remanded the case for rehearing before ALJ Diane Townsend-Anderson. (Admin. R. at 487.) Kirchner was given the opportunity to submit additional medical records before the second hearing. (*Id.* at 502.)

2

In the meantime, Kirchner filed a new application for SSDI, which was granted with a disability onset date of February 27, 2009, the day after the first unfavorable decision on his application. (*Id.* at 398.) Kirchner then testified at a hearing before ALJ Diane Townsend-Anderson ("the ALJ") on January 25, 2012, and the issue was whether Kirchner was entitled to SSDI from October 2004 through February 26, 2009. (*Id.* at 415-438.) On April 3, 2012, the ALJ issued an unfavorable decision. (*Id.* at 395-414.) The Appeals Council denied review rendering the ALJ's decision final. *See* 42 U.S.C. § 405(g); *Browning v. Sullivan*, 958 F.2d 817, 822 (8th Cir. 1992). Kirchner now seeks judicial review pursuant to 42 U.S.C. § 405(g).

### B. Kirchner's Testimony

At the hearing on January 25, 2012, Kirchner testified that he saw a physician in 2001 regarding worker's compensation, and he asked about something that looked like sunburn on his legs. (Admin. R. at 421-22.) He was told it was not sunburn; it was varicose veins and dermatitis. (*Id.*) Kirchner is susceptible to bleeding on his feet and legs. (*Id.* at 418.) The first time he noticed this was when he bumped his foot on a recliner, and it started bleeding profusely. (*Id.* at 419-20.) He was treated for water retention and swelling in his legs, and it took about a week for the swelling to go down. (*Id.* at 420-21.) Subsequently, he took the same medication for leg swelling on a couple of occasions. (*Id.* at 21.)

Kirchner worked part-time during the relevant alleged disability period. (*Id.* at 424.) He worked weekends as a security person at Red Wing Shoe Company, and he walked seven miles per night, wearing compression socks. (*Id.* at 426.) The job was eliminated in April 2008. (*Id.* at 427.) Since then, he spent his days "putsing around with some woodworking stuff." (*Id.* at 424.) He and his grandson built birdhouses, and he helped his grandson with homework. (*Id.*)

3

Kirchner now has trouble walking to the end of his driveway due back pain, and cannot feel his feet. (*Id.* at 424-26.) He is much worse now than he was in 2004-2009. (*Id.* at 425-26.)

Kirchner also testified that his narcolepsy progressed, and that he fell asleep at his last hearing. (*Id.* at 434.) Years earlier, when he worked as a truck mechanic, he fell asleep sitting on a running engine and could have lost an arm because the engine was 300 degrees. (*Id.* at 435.)

    **C.**    **The Medical Expert's Testimony**

Dr. Joseph C. Horozaniecki testified as a medical expert at the hearing before ALJ Townsend-Anderson. (Admin. R. at 398.) He testified that Kirchner had the following documented impairments: chronic low back pain, intermittent left lower extremity radiculopathy due to lumbar degenerative disk disease, obesity, hearing loss, obstructive sleep apnea, narcolepsy treated with Adderall, diabetes type II, venous insufficiency with moderate edema, and venous stasis dermatitis. (*Id.* at 429-30.) Kirchner had one episode of bleeding from a minor trauma to a varicose vein, but there wasn't evidence in the record of open ulcerations on his legs that lasted three months or longer. (*Id.* at 430.) According to Dr. Horozaniecki, during the relevant period, Kirchner's impairments, singly or in combination, did not meet or equal a listed impairment. (*Id.* at 431.) Kirchner was limited to modified light exertional work, with time on his feet for standing or walking limited to four hours, sitting limited to four hours; and he could bend, crouch or stoop only occasionally. (*Id.*) Due to narcolepsy, Kirchner was restricted from working around unprotected heights or exposure to workplace hazards. (*Id.*) Due to obesity, he was restricted from climbing ladders or scaffolds. (*Id.*)

4

Kirchner's counsel asked Dr. Horozaniecki whether there was anything in the medical records to indicate that Kirchner would fall asleep every thirty minutes. (*Id.* at 436.) Dr. Horozaniecki responded,

> [T]he medical record certainly supports that the narcolepsy has been an ongoing and significant problem. He's failed a number of typical medications for that, and the latest that was tried was the Adderall. And certainly the medical record does support that it's been a significant problem.

(*Id.*) Nonetheless, Dr. Horozaniecki testified Kirchner did not meet or equal a listed impairment for narcolepsy. (*Id.*)

### D. Medical Evidence – Venous Stasis Dermatitis[2]

Venous insufficiency is a chronic condition where the veins have problems sending blood from the legs back to the heart.[3] Some people with venous insufficiency develop stasis dermatitis, where blood pools in the veins, and fluid and blood leak out of the veins into the skin and other tissue. *Id.* The skin can itch, turn brown, and/or become thin, red, swollen, crusted or weepy. *Id.* Skin sores, called ulcers, may develop. *Id.* Possible complications include infections and chronic leg ulcers. *Id.*

Pigment changes in Kirchner's legs prompted him to see Dr. John Goeppinger at Red Wing Clinic in September 2001. (Admin. R. at 185-86.) Dr. Goeppinger diagnosed venous stasis dermatitis, and noted it had been there for a long time. (*Id.* at 185.) A diagnosis of venous stasis appears in the record again on January 30, 2006, when Dr. Louis Chen examined Kirchner

---

[2] Based on the limited issues raised in this case, the Court has restricted its summary of the medical records to the records the ALJ and parties cited in her decision and in their briefs, respectively.

[3] Stasis dermatitis and ulcers, Medline Plus available at http://www.nlm.nih.gov/medlineplus/ency/article/000834.htm Ulcers are lesions through the skin or a mucous membrane resulting from loss of tissue, usually with inflammation. *Stedman's Medical Dictionary* 1903 (27th ed. 2000.) Lesions are pathologic changes in the tissues. *Id.* at 987.

at the VA Medical Center in Minneapolis, and noted there were no infections associated with Plaintiff's bilateral lower extremity dermatitis. (*Id.* at 227-29.) Dr. Chen prescribed moisturizing lotions and told Kirchner to let him know if they did not work. (*Id.* at 229.) Several months later, Kirchner had mild to moderate varicosities in his legs and feet. (*Id.* at 196.)

In June 2006, Kirchner bumped his leg against a recliner, causing an arterial bleed. (Tr. 223-24.) He called the VA Medical Center and was given instructions to stop the bleeding with compression. (*Id.* at 224.) His legs were swelling from the knees down. (*Id.*) Kirchner saw Dr. Chen two weeks later. (*Id.*) Kirchner was diagnosed with stasis dermatitis with pitting edema,[4] but his decubitus sores[5] were healed, and he had no infections. (*Id.* at 219-22.) Dr. Chen prescribed a short course of Lasix and compression stockings. (*Id.* at 222.) He instructed Kirchner to call if he experienced significant leg swelling. (*Id.*) In follow up on July 17, 2006, Kirchner's leg swelling was gone, and he was instructed to call if it returned. (*Id.* at 266.)

When Kirchner underwent a physical consultative examination with Dr. Ward Jankus on October 1, 2006, Dr. Jankus observed that Kirchner had moderate venous stasis dermatitis with a few scrapes but no major wounds or infection. (*Id.* at 258.) At that time, Kirchner worked part-time, two or three days per week, as a security guard at Red Wing Shoe Factory. (*Id.* at 256.) During his six-hour shifts, he walked six rounds, one mile per round. (*Id.*) Each round took fifteen to twenty minutes, and he was off his feet the rest of the shift. (*Id.* at 257.) He preferred walking because it kept his back loosened up. (*Id.*)

---

[4] Pitting edema is characterized by tissues that show the prolonged existence of pits caused by pressure. *Dorland's Illustrated Medical Dictionary* ("*Dorland's*") 600 (31st ed. 2007).

[5] Decubitus means lying down, but it also is used to describe an ulcer. *Dorland's* at 483.

In December 2006 and again in May 2007, Dr. Chen noted dry skin on Kirchner's legs,[6] but there was "no breakdown." (*Id.* at 300, 326.) It was important for Kirchner to keep his legs moisturized to prevent problems and to call if his edema returned. (*Id.* at 301, 327.) On January 7, 2008, Kirchner had a lesion on his right ankle that he said was there for a few months. (*Id.* at 290.) Dr. Chen described it as a blanching vascular lesion without cellulitis or TTP.[7] (*Id.* at 292.) He questioned whether it was a lesion or a fibroma[8] forming. (*Id.* at 298.) In March 2008, Plaintiff's active prescriptions included treatment for stasis dermatitis, furosemide (Lasix) and Vanicream. (*Id.* at 382-84.)

### E. Medical Evidence – Narcolepsy

In November 2001, Kirchner underwent a sleep study and was diagnosed with narcolepsy and obstructive sleep apnea. (Admin. R. at 385.) Consistent with narcolepsy, he fell asleep one minute after the study began. (*Id.*) In September 2004, Dr. Goeppinger started Kirchner on Provigil (modafinil) to treat sleep apnea and narcolepsy. (*Id.* at 183-85.) Kirchner's level of alertness was unchanged as long as he took his medication. (*Id.* at 185.) On December 29, 2004, however, Dr. Chen noted that Adderall was not working for Kirchner, and he continued to fall asleep "all the time." (*Id.* at 252-53.) Kirchner had only two days of Adderall pills left, so Dr. Michael J. Howell agreed to see him that day and assess whether Provigil would be an appropriate treatment. (*Id.* at 253, 209.) Kirchner told Dr. Howell that the HCMC Sleep Center had recommended Provigil as "the optimal treatment," and Dr. Howell prescribed a three-month

---

[6] The Court assumes Dr. Chen's abbreviation "le" stands for lower extremity (leg).
[7] Cellulitis is an acute, diffuse, spreading inflammation of the deep subcutaneous tissues, sometimes with abscess formation. *Dorland's* at 330. TTP is thrombotic thrombocytopenic purpura, a blood disorder that causes blood clots to form in small blood vessels around the body. Thrombotic thrombocytopenic purpura, Medline Plus, available at http://www.nlm.nih.gov/medlineplus/ency/article/000552.htm
[8] A fibroma is a tumor composed of mainly fibrous or fully developed connective tissue. *Dorland's* at 710.

supply. (*Id.*) He also ordered a neurology consultation for medication evaluation. (*Id.* at 209, 210.)

In his neurology consultation with Dr. Shelly Larson on March 15, 2005, Kirchner wanted to return to Adderall for treatment of his narcolepsy because he was consistently falling asleep during the day. (*Id.* at 210.) Dr. Larson agreed, noting Kirchner had previously been on Adderall for eight years, and he found it to be the most effective medication for his daytime functioning. (*Id.* at 210, 214-15.) Dr. Larson advised Kirchner to follow up with any worsening or new symptoms. (*Id.* at 215.) On several occasions between September 2005 and July 2006, Dr. Chen noted that Kirchner's narcolepsy was "doing well" when treated with Adderall. (*Id.* at 222, 229, 238, 266.)

But in October 2006, Kirchner told Dr. Larson that his daytime sleepiness had increased, and he noticed a wearing off effect of his medication. (*Id.* at 260-62.) Dr. Larson discovered a mistake had been made in filling Kirchner's Adderall prescription, and he was only getting half the dose prescribed. (*Id.* at 262.) The mistake was corrected. (*Id.*) On three subsequent occasions between December 2006 and January 2008, Dr. Chen noted Kirchner was doing well with respect to his narcolepsy. (*Id.* at 293, 301, 327.) Notably, in December 2006, Kirchner's wife told Dr. Chen that Kirchner sometimes forgot to take his Adderall, and Dr. Chen recommended using a timer. (*Id.* at 324-27.)

### F.  State Agency Medical Consultants' Opinions

At the request of the SSA, a state agency consultant, Dr. Gregory H. Salmi, reviewed Kirchner's social security disability file on October 16, 2006, on initial consideration of his application for disability. (Admin. R. at 271-77.) He noted that Kirchner was diagnosed with narcolepsy many years ago, and he used Adderall in the past with good results. (*Id.* at 271.)

Kirchner had moderate venous stasis changes but no wounds or infection. (*Id.*) Dr. Salmi opined that Kirchner had the residual functional capacity to occasionally lift and carry fifty pounds, and frequently lift and carry twenty-five pounds. (*Id.* at 271.) He could stand or walk and sit for six hours each in an eight-hour workday. (*Id.*) He could never climb ladders, ropes or scaffolds and only occasionally climb ramps and stairs. (*Id.* at 272.) Frequently, Kirchner could balance but he was limited to occasional stooping, kneeling, bending, crouching and crawling. (*Id.*) He would need to avoid even moderate exposure to hazards, including driving. (*Id.* at 274.) Dr. Dan Larson reviewed Kirchner's social security disability file on December 22, 2006, upon reconsideration of his application for disability benefits. (*Id.* at 282-83.) He affirmed Dr. Salmi's residual functional capacity ("RFC") opinion. (*Id.* at 282.)

### G. Evidence from the Vocational Expert

Cheryl Zilka testified as a vocational expert. (*Id.* at 432-37.) The ALJ asked Zilka to consider a person with a high school education, who was 48-53 years-old during the relevant time period, had work experience as outlined in the vocational expert's report, and possessed the transferable skill of "inspection." (*Id.* at 432.) The individual also had diminished hearing, back pain due to degenerative disc disease with some left radiculopathy, non-insulin dependent diabetes, occasional dermatological issues with nails, varicose veins and venous stasis, obesity, narcolepsy and sleep apnea. (*Id.*) The ALJ told Zilka to assume the individual had the same functional restrictions the medical expert described. (*Id.* at 432-33.) Zilka testified such a person could not perform Kirchner's past work but could perform jobs such as electrical tool repairer and inspector.[9] (*Id.* at 433.) In response to questioning by Kirchner's counsel, Zilka

---

[9] Electrical tool repairer is found in the Dictionary of Occupational Titles ("DOT") under Code 729.281-022. (Admin. R. at 433.) For the job of inspector, the VE cited DOT Code 609.684-010. (*Id.*)

9

testified that if a person fell asleep on the job after being seated for thirty minutes, it would preclude employment. (*Id.* at 434.)

### H. The ALJ's Decision

On April 3, 2012, the ALJ issued an unfavorable decision. (*Id.* at 395-414.) In finding that Kirchner was not disabled, the ALJ employed the required five-step evaluation considering: (1) whether Kirchner was engaged in substantial gainful activity; (2) whether Kirchner had severe impairments; (3) whether Kirchner had an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1; (4) whether based on the claimant's residual functional capacity, he could perform his past relevant work; and, if not, (5) whether there is other work that exists in significant numbers in the national economy that the claimant could perform. *See* 20 C.F.R. § 404.1520(a)(4).

At the first step of the evaluation, the ALJ found Kirchner had not engaged in substantial gainful activity from his alleged onset date of October 20, 2004 through February 26, 2009, the day before he was determined to be disabled. (*Id.* at 401) (citing 20 C.F.R. § 404.1571 *et seq.*). Kirchner had worked in 2005 through 2009, but his earnings were all below the level for substantial gainful activity. (*Id.*) At the second step, the ALJ found that Kirchner had severe impairments of lumbar degenerative disc disease with chronic back pain and left lower extremity radiculopathy, obesity, non-insulin dependent diabetes, hearing loss, venous stasis with varicose veins, obstructive sleep apnea with hypersomnia, excessive daytime sleepiness and narcolepsy. (*Id.*) (citing 20 C.F.R. § 404.1520(c)).

At step three, the ALJ concluded Kirchner did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (*Id.*) (citing 20 C.F.R. §§ 404.1520(d), 404.1525(d)). The ALJ relied on the medical expert's testimony. (*Id.*) She found Kirchner did not meet or equal Listing 4.11, chronic venous insufficiency because he did not have recurrent or persistent ulcerations that did not heal following at least three months of treatment. (*Id.*)

At step four of the evaluation, the ALJ determined Kirchner had the residual functional capacity to:

> Perform light work as defined in 20 CFR 404.1567(b) with lifting and carrying 20 pounds occasionally and 10 pounds frequently; with a maximum time on feet (i.e. standing/walking) limited to four hours out of an eight-hour workday; sitting four hours out of an eight-hour workday; only occasional bending, stooping, crouching, crawling, twisting, and climbing; no exposure to heights, ladders, scaffolds, or dangerous/hazardous equipment or machinery.

(*Id.* at 402-03.) The ALJ concluded that Kirchner's back pain would limit him to light work. (*Id.* at 403.) The evidence in the record did not support greater limitations. (*Id.*) There was objective evidence of degenerative changes in his spine and reduced range of motion. (*Id.*) Conservative treatments, however, reduced his pain. (*Id.* at 404.) Walking also eased his back pain. (*Id.*) Kirchner's diabetes and obesity contributed to his light exertional limitations. (*Id.*)

The ALJ considered evidence of Kirchner's chronic venous insufficiency but concluded his treatments with compression stockings, Lasix and topical medications were effective. (*Id.*) Records described Kirchner's wounds as healed. (*Id.*) His venous insufficiency did not require any greater work restrictions than in the RFC. (*Id.*) Furthermore, Kirchner told the consultative examiner in October 2006 that he could be on his feet five or six hours per day. (*Id.*) His sleep apnea and narcolepsy precluded him from being near hazards at work. (*Id.* at 405.) Nothing in

11

the evidence, however, suggested Kirchner would fall asleep every thirty minutes. (*Id.*) Beginning in late 2006, Kirchner's narcolepsy was stable and controlled with medication. (*Id.*)

Kirchner's daily activities were at times generally greater than what he reported. (*Id.* at 406.) Kirchner walked miles in his six-hour shift as a part-time security guard. (*Id.*) He said he could lift fifty pounds. (*Id.*) In mid-2007, he was on his feet seven or eight hours per day. (*Id.*) He hunted, bowled, attended his grandchildren's sporting events, made birdhouses and drove a car to go shopping. (*Id.*) The ALJ also noted Kirchner had non-medical reasons for not working. (*Id.* at 405.) Kirchner had an archery store that he closed because it was losing money. (*Id.*) Kirchner had financial disincentive to return to full-time employment because he received $1380 per month from Veteran's benefits. (*Id.*) Nonetheless, in 2006, he applied for many jobs but was unsuccessful. (*Id.*) Kirchner's physical condition worsened since February 26, 2009, but clinical findings and treatment were quite minimal prior to then, and he lived a fairly active lifestyle. (*Id.* at 406.) The ALJ gave great weight to the medical expert's RFC opinion, and the state agency physicians' opinions also supported a finding of not disabled. (*Id.*) The ALJ gave Dr. Jankus' opinion limited weight because it was "heavily based" on Kirchner's subjective complaints, but was consistent with the ALJ's RFC determination. (*Id.* at 406-07.)

The ALJ found Kirchner could not perform his past relevant work. (*Id.* at 407) (citing 20 C.F.R. § 404.1565). Based on the vocational expert's testimony, Kirchner would be able to perform other jobs that exist in significant numbers in the national economy such as electric tool repairer and inspector. (*Id.* at 407-08) (citing 20 C.F.R. § 404.1569, 404.1569(a). Therefore, Kirchner was not under a disability, as defined in the Social Security Act, from October 20, 2004 through February 26, 2009, one day before he was determined to be disabled. (*Id.* at 408) (citing 20 C.F.R. § 404.1520(g)).

## II. STANDARD OF REVIEW

The standards governing the award of Social Security disability benefits are congressionally mandated: "[t]he Social Security program provides benefits to people who are aged, blind, or who suffer from a physical or mental disability." *Locher v. Sullivan*, 968 F.2d 725, 727 (8th Cir. 1992). "Disability" under the Social Security Act is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment." 42 U.S.C. § 423(d)(1)(A). A claimant's impairments must be "of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work that exists in the national economy." 42 U.S.C. § 423(d)(2)(A).

### A. Administrative Review

If a claimant's initial application for benefits is denied, he may request reconsideration of the decision. 20 C.F.R. § 404.909(a)(1). A claimant dissatisfied with the reconsidered decision may seek an ALJ's administrative review. 20 C.F.R. § 404.929. If the claimant is dissatisfied with the ALJ's decision, then an Appeals Council review may be sought, although that review is not automatic. 20 C.F.R. §§ 404.967–982. If the request for review is denied, then the Appeals Council or ALJ's decision is final and binding upon the claimant unless the matter is appealed to federal district court. 42 U.S.C. § 405(g); 20 C.F.R. § 404.981. An appeal of either the Appeals Council or the ALJ's decision must occur within sixty days after notice of the Appeals Council's action. *Id.*

### B. Judicial Review

If "substantial evidence" supports the findings of the Commissioner, then these findings are conclusive. 42 U.S.C. § 405(g). This Court's review of the Commissioner's final decision is

deferential because the decision is reviewed "only to ensure that it is supported by 'substantial evidence in the record as a whole.'" *Hensley v. Barnhart*, 352 F.3d 353, 355 (8th Cir. 2003) (citation and internal quotation marks omitted)). A court's task is limited to reviewing "the record for legal error and to ensure that the factual findings are supported by substantial evidence." *Id.*

The "substantial evidence in the record as a whole" standard does not require a preponderance of the evidence but rather only "enough so that a reasonable mind could find it adequate to support the decision." *Edwards v. Barnhart*, 314 F.3d 964, 966 (8th Cir. 2003). Yet, this Court must "consider evidence that detracts from the Commissioner's decision as well as evidence that supports it." *Burnside v. Apfel*, 223 F.3d 840, 843 (8th Cir. 2000). Thus, a "notable difference exists between 'substantial evidence' and 'substantial evidence on the record as a whole.'" *Wilson v. Sullivan*, 886 F.2d 172, 175 (8th Cir. 1989) (internal citation omitted).

> "Substantial evidence" is merely such "relevant evidence that a reasonable mind might accept as adequate to support a conclusion." "Substantial evidence on the record as a whole," however, requires a more scrutinizing analysis. In the review of an administrative decision, "[t]he substantiality of evidence must take into account whatever in the record fairly detracts from its weight." Thus, the court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contradictory.

*Id.* (internal citation omitted).

In reviewing the ALJ's decision, this Court analyzes the following factors: (1) the findings regarding credibility; (2) the claimant's education, background, work history, and age; (3) the medical evidence provided by the claimant's treating and consulting physicians; (4) the claimant's subjective complaints of pain and description of physical activity and impairment; (5) third parties' corroboration of the claimant's physical impairment; and (6) the VE's testimony based on proper hypothetical questions that fairly set forth the claimant's impairments. *Brand v.*

14

*Sec'y of the Dept. of Health, Educ. & Welfare*, 623 F.2d 523, 527 (8th Cir. 1980). Proof of disability is the claimant's burden. 20 C.F.R. § 404.1512(a). Thus, "[t]he burden of persuasion to prove disability and to demonstrate RFC remains on the claimant, even when the burden of production shifts to the Commissioner at step five." *Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004).

Reversal is not appropriate "merely because the evidence is capable of supporting the opposite conclusion." *Hensley*, 352 F.3d at 355. If substantial evidence on record as a whole permits one to draw two inconsistent positions and one of those represents the Commissioner's findings, then the Commissioner's decision should be affirmed. *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001). This Court's task "is not to reweigh the evidence, and [the Court] may not reverse the Commissioner's decision merely because substantial evidence would have supported an opposite conclusion or merely because [the Court] would have decided the case differently." *Harwood v. Apfel*, 186 F.3d 1039, 1042 (8th Cir. 1999).

## III. DISCUSSION

Kirchner alleges the ALJ committed three errors: 1) the ALJ erred by not finding that he met or equaled Listing 4.11(B); 2) the ALJ erred by finding that his narcolepsy was not disabling; 3) the ALJ drew improper inferences from the medical records and reports. (Pl's Mem. in Supp. of Mot. for Summ. J. at 9-16 ("Pl's Mem."))

### A. Listing 4.11(B)

If a claimant meets or equals all of the requirements of a listed impairment, he is presumptively disabled without regard to age, education or work history. 20 C.F.R. § 404.1520(d); *see Carlson v. Astrue*, 604 F.3d 589, 593 (8th Cir. 2010) ("To meet a listing, an

impairment must meet all of the listing's specified criteria.") (quoting *Johnson v. Barnhart*, 390 F.3d 1067, 1070 (8th Cir. 2004)).

Listing 4.11 Chronic venous insufficiency of a lower extremity with incompetency or obstruction of the deep venous system is met when there is evidence of one of the following:

> A. Extensive brawny edema (see 4.00G3) involving at least two-thirds of the leg between the ankle and knee or the distal one-third of the lower extremity between the ankle and hip OR
> B. Superficial varicosities, stasis dermatitis, and either recurrent ulceration or persistent ulceration that has not healed following at least 3 months of prescribed treatment.

20 C.F.R. Part 404, Subpart P, Appendix 1, § 4.11.

"Persistent" means the required findings have been or are expected to be present for a continuous period of at least twelve months, showing a pattern of continuing severity. 20 C.F.R. Part 404, Subpart P, Appendix 1, § 4.00A3(b). Recurrent means that within a consecutive twelve-month period, the required findings occur at least three times, with the intervening periods of improvement of sufficient duration to make clear that separate events are involved. *Id.* § 4.00A3(c).

Kirchner contends he met the listing based on evidence that on September 10, 2004, a physician noted that he had venous stasis dermatitis for a long time, and he was subsequently diagnosed with venous stasis on June 30, 2006, February 2, 2006, July 2006, and October 2006. (Pl's Mem. at 11.) Kirchner asserts, contrary to the medical expert's testimony, the listing does not require a persistent ulceration, it requires only persistent venous stasis. (*Id.* at 12 and Pl's Reply Mem. at 6.)

A plain reading of the listing, however, requires evidence of recurrent or persistent ulceration. After the case was remanded for further proceedings, Kirchner was given the opportunity to submit additional evidence at the hearing, and to testify about his venous stasis

dermatitis. He did not have additional medical records showing ulcerations on his legs and did not testify that he had ulcerations which were not reflected in the records. Kirchner's ulcerations were healed in July 2006; he had a few scrapes but no major wounds in October 2006; and he had a blanching vascular lesion in January 2008, that Kirchner stated was present for a few months. Although a March 2008 record showed Kirchner's active medications included treatment for stasis dermatitis, Lasix and Vanicream, the record did not establish that he had unhealed ulcerations on his legs. Kirchner did not establish that he met or equaled Listing 4.11(B).

### B. RFC

A claimant's RFC is what he or she can do despite his or her limitations. 20 C.F.R. § 404.1545(a). In determining a claimant's RFC, the ALJ must consider all relevant evidence and evaluate the claimant's credibility. *Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005). "The ALJ may reject [the conclusions of any medical expert, whether hired by the claimant or the government] if they are inconsistent with the record as a whole . . ." *Heino v. Astrue*, 578 F.3d 873, 879 (8th Cir. 2009) (quoting *Wagner v. Astrue*, 499 F.3d 842, 848 (8th Cir. 2007)).

An ALJ may not discount a claimant's subjective complaints based solely on lack of objective findings to explain the severity of the symptoms. *Goff v. Barnhart*, 421 F.3d 785, 792 (8th Cir. 2005). An ALJ may, however, discount subjective complaints if they are "inconsistent with the evidence as a whole." (*Id.*) (quoting *Strongson v. Barnhart*, 361 F.3d 1066, 1072 (8th Cir. 2004)) (internal quotation omitted)). In assessing credibility, the ALJ should consider factors including prior work record; observations by physicians and other third parties; the claimant's daily activities; the duration, frequency and intensity of the symptoms; the claimant's treatment, its effectiveness, and side effects; precipitating and aggravating factors; and functional

restrictions. *Polaski v. Heckler*, 739 F.3d 1320, 1322 (8th Cir. 1984). Courts should not disturb the ALJ's credibility decision if the ALJ discredits the claimant's subjective complaints for "good cause." *Goff*, 421 F.3d at 792 (quoting *Gowell v. Apfel*, 242 F.3d 793, 796 (8th Cir. 2001)).

### 1. Narcolepsy

Kirchner contends it was error for the ALJ to credit the statement of a nonexamining physician, Dr. Dan Larson, finding that his narcolepsy was stable and controlled with Adderall, in light of medical records from treating physicians indicating Adderall did not always work. (Pl's Mem. at 13-15.) Kirchner suggests the medical expert's testimony that narcolepsy was an ongoing and significant problem supports a finding that his narcolepsy precludes full-time employment. (*Id.*)

It is true that Kirchner told Dr. Chen in December 2004 that Adderall was not working for him, and he fell asleep all the time. Dr. Chen referred Kirchner to Dr. Howell, who prescribed Provigil on Kirchner's request. A few months later, Kirchner saw a neurologist and reported that he consistently fell asleep throughout the day. He wanted to go back on 60 mg Adderall per day because it was the most effective treatment for him over a previous eight-year period. Kirchner did not complain about daytime sleepiness again until October 2006, when he noticed increased sleepiness and a wearing off effect of his medication. This is when Dr. Larson discovered a mistake had been made in filling Kirchner's prescription for Adderall, and he was only getting half the dose. Once the dosage was corrected, no further evidence exists in the record that Kirchner was falling asleep during the day. The record as a whole supports the ALJ's conclusion that Adderall controlled Kirchner's narcolepsy. Kirchner failed to establish that his narcolepsy required any work restrictions beyond the ALJ's limitation of avoiding hazards.

### 2. Inferences drawn from the medical records

Kirchner asserts that the "substantial medical evidence in the record as a whole" consists of Dr. Chen's medical treatment notes and the HCMC sleep studies. (Pl's Mem. at 15.) Because the ALJ relied on nonexamining physicians' opinions, which do not normally constitute substantial evidence on the record as a whole, Kirchner contends the ALJ made improper inferences by interpreting the medical records consistent with the nonexamining physicians' opinions. (*Id.* at 15-16.)

Here, the ALJ relied on the medical expert's testimony and also found it to be consistent with the state agency physicians' opinions. However, the ALJ also considered all of the relevant medical records and Kirchner's testimony. There were no treating physician statements about whether Kirchner's narcolepsy or venous stasis dermatitis caused work restrictions. *See Powell v. Heckler*, 741 F.2d 221, 222-23 (8th Cir. 1984) (affirming ALJ's RFC finding where examining physicians had not placed any restrictions on the claimant's ability to do sedentary work). An ALJ may rely on a nonexamining physician's opinion as one factor in determining RFC when the ALJ has considered all of the evidence in the record. *Casey v. Astrue*, 503 F.3d 687, 697 (8th Cir. 2007); *see Masterson v. Barnhart*, 363 F.3d 731, 739 (8th Cir. 2004) (ALJ properly determined RFC where ALJ relied on consultative examiner's and nonexamining physician's opinions, the treating physicians had not restricted the claimant's activities in any way, and ALJ properly considered all evidence in discounting claimant's subjective complaints). For all of these reasons, the ALJ's decision should be affirmed.

## IV. RECOMMENDATION

Based on all the files, records, and proceedings herein, IT IS HEREBY RECOMMENDED that:

1. Kirchner's Motion for Summary Judgment [Doc. No. 6] be **DENIED**;

2. The Commissioner's Motion for Summary Judgment [Doc. No. 9] be **GRANTED**.

Dated: July 9, 2013

*s/ Steven E. Rau*
STEVEN E. RAU
United States Magistrate Judge

Under D.Minn. LR 72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court, and serving all parties by **July 23, 2013**, a writing which specifically identifies those portions of the Report to which objections are made and the basis of those objections. Failure to comply with this procedure may operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals. A party may respond to the objecting party's brief within fourteen days after service thereof. A judge shall make a de novo determination of those portions to which objection is made. This Report and Recommendation does not constitute an order or judgment of the District Court, and it is therefore not appealable to the Court of Appeals.